# In the United States Court of Federal Claims

No. 25-78C

(Filed under seal: July 24, 2025)

(Filed: August 1, 2025)

|  |  |
|---|---|
| **TISTA SCIENCE & TECHNOLOGY CORPORATION,** | ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | ) ) |
| **THE UNITED STATES,** | ) ) |
| *Defendant,* | ) ) |
| **and** | ) ) |
| **BOOZ ALLEN HAMILTON INC.,** | ) ) |
| *Defendant-Intervenor.* | ) ) ) |

*Noah Benjamin Bleicher*, Jenner & Block, LLP, Washington, D.C., for Plaintiff. Of counsel were *Moshe B. Broder*, *Aime J. Joo*, and *Sierra A. Paskins*.

*Tanya B. Koenig*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. With her on the briefs were *Yaakov M. Roth*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Assistant Director.

*Kristen E. Ittig*, Arnold & Porter Kaye Scholer LLP, Washington, D.C., for Defendant-Intervenor. Of counsel were *Thomas A. Pettit* and *Nicole A. Williamson*.

<u>**OPINION AND ORDER**</u>*

**SOLOMSON, Chief Judge.**

The Department of Veterans Affairs ("VA" or "Agency") awarded a $316 million contract for IT services to Booz Allen Hamilton Inc. ("BAH").  Plaintiff, TISTA Science and Technology Corporation ("TISTA"), challenges the VA's contract award decision on two grounds:  (1) BAH has an unmitigated organizational conflict of interest ("OCI") that precludes the VA from awarding BAH the contract; and (2) the VA's evaluation of TISTA's proposal was flawed to the point of being arbitrary and capricious.

For the reasons explained below, TISTA fails to meet its burden.  This is not the type of case where this Court is asked to evaluate the facts against some binary standard (*e.g.,* where the plaintiff argues that it was prejudiced because the government failed to perform some mandatory analysis); or where the government reached a conclusion that is unsupported by the administrative record.   Instead, TISTA asks this Court to reach different conclusions than the Agency based on facts it found that *are* supported by the administrative record.  At the end of the day, this is precisely the sort of uphill battle protest that seldom prevails.  It is not impossible for such a challenge to succeed, of course, but given the deferential standard of review, this Court cannot conclude in this case either that the VA's factual findings are unsupported or that its discretionary assessments were irrational.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  The Transformation Support Services 2.0 Procurement

### 1.  The VA's request for proposals

---

* On July 24, 2025, this Court issued this opinion and order under seal and provided the parties the opportunity to file proposed redactions by July 31, 2025.  ECF No. 37.  The parties jointly filed a proposed redacted version on that date.  ECF No. 39.  This Court incorporates those redactions in this public version of the opinion.  Redacted words and phrases have been replaced with [ * * * ].

[1] This background section constitutes this Court's findings of fact drawn from the administrative record. Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), covering judgment on the administrative record, "is properly understood as intending to provide for an expedited trial on the record" and requires courts to "make factual findings from the record

In 2024, the VA issued Solicitation No. 36C10B24Q0626 as a request for proposals (the "RFP" or "Solicitation")[2] for the Transformation Support Services ("TSS") 2.0 procurement.[3] AR 1128. The TSS 2.0 procurement is a recompete of an existing TSS task order, which also had been awarded to BAH. AR 457, 4075–76. The VA, in its TSS 2.0 acquisition plan, explained that the goal of the new contract is to "provide support for remediation of the VA's Material Weakness . . . as well as a ready response platform to address emerging and evolving policies, initiatives, and mandates that support a proactive cybersecurity posture and reduce risks across [the Office of Information Technology ("OIT")]." AR 457.[4] To procure these services, the Agency issued an RFP to

---

evidence as if [they] were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005). Other factual findings are contained in the Discussion section of this opinion, *infra* Section IV. Citations to the administrative record, ECF No. 21, are denoted as "AR" followed by the page number bolded in the lower right-hand corner of each page of the administrative record.

[2] Although the parties repeatedly refer to the Solicitation in this procurement as an RFP, the Solicitation refers to itself as a request for quotes — an "RFQ." *See* AR 1254 (§ C.1) ("The terms and conditions of the contractor's FSS contract (including any contract modifications) apply to all Blanket Purchase Agreements (BPA) and task or delivery orders issued under the contract as a result of this RFQ."). That makes sense given that this procurement is being conducted under Federal Acquisition Regulation ("FAR") part 8. AR 461; AR 1265 (§ E.6) (referencing the GSA's eBuy suite); AR 1270. (The FAR is codified at Title 48, Ch. 1, of the Code of Federal Regulations.) "[T]ypically, there is a distinction between procurements conducted pursuant to FAR Parts 14 and 15, on the one hand, and FAR Part 8 procurements, on the other: the former solicit bids or proposals from bidders or offerors, respectively, while the latter solicits quotations." *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 91 (2020) (emphasis omitted); *see also* FAR 2.101 (defining "offer," distinguishing between bids and proposals, and explaining that "responses to requests for proposals (negotiation) are offers called 'proposals'; however, responses to requests for quotations (simplified acquisition) are 'quotations', not offers"). Indeed, FAR 8.402(d)(1) describes "eBuy, GSA's electronic [RFQ] system[,]" as being "part of a suite of online tools" and which "allows ordering activities to post requirements, obtain quotes, and issue orders electronically." Other parts of the Solicitation, however, suggest that the VA sought "proposals" from "Offerors." AR 1265 (§ E.6 (Proposal Submission)). For the purpose of this dispute, however, the characterization of the Solicitation as an RFP or RFQ is immaterial, and so this Court uses the parties' RFP terminology.

[3] The Solicitation was amended five times; the fifth and final amendment was issued on September 30, 2024. AR 1128.

[4] The record does not appear to specify which "material weakness" the TSS 2.0 contractor would focus on, but the VA seems to present a target-rich environment. *See, e.g.,* https://www.gao.gov/assets/gao-25-107256.pdf [https://perma.cc/F92A-JF6R] ("VA's financial statement auditors have long reported a material weakness related to VA's financial management systems."); https://www.vaoig.gov/sites/default/files/reports/2021-11/VAOIG-21-01052-33.pdf [https://perma.cc/N8A3-LW2U] (discussing audit report that "identified three material weaknesses in

all prime contract holders on General Services Administration's ("GSA") Multiple Award Schedule ("MAS") Information Technology Professional Services ("PS") Special Item Number ("SIN") 54151S. AR 461. The Agency intended to award a single hybrid firm-fixed-price and time-and-materials task order contract,[5] using a "best value-trade off source selection process." AR 461. The government initially estimated the task order would cost nearly [* * *], for just a 12-month base period, a 12-month option, and a 60-day optional transition period. AR 458.

## 2. Proposal instructions

The RFP instructed offerors to submit their proposals in five volumes: Volume I – Technical; Volume II – Past Performance; Volume III – Price/Cost; Volume IV – Veterans' Involvement; and Volume V – Solicitation, Offer and Award Documents, Certifications & Representations. AR 1265.

For Volume I – Technical Factor, the Solicitation instructed offerors to submit a "detailed approach" to five different aspects of the Performance Work Statement ("PWS").[6] AR 1267–69. The first section involved describing an approach to auditing, in accordance with PWS § 5.2.1, including §§ 5.2.1.1 – 5.2.1.11. *Id.* The RFP required offerors to describe their approach to "Audit Remediation," "providing cybersecurity field operations support," and "implementing change control procedures." *Id.* The second section had to address PWS §§ 5.2.6 and 5.2.7, which included a "strategy for supporting VA's hybrid environment for audit logging metrics, and multi-SIEM (Security Information and Event Management) support" and "Implementation Management." AR 1267–68. The third section covered PWS § 5.2.11, specifically §§ 5.2.11.3 and 5.2.11.4, which included "assessing current cloud security frameworks" and "vulnerability analysis." *Id.* In the fourth section, offerors had to address PWS § 5.3, specifically §§ 5.3.5 and 5.3.6, describing the offeror's approach to "performance testing" and "how [offerors] would manage Active Directory, group policies, and user access." *Id.* Finally, the fifth section required a "clear description of the management methodology that will be used for executing the effort" (*e.g.*, recruiting and staffing). *Id.*

---

internal control[s,]" and noting that "[t]he material weakness involving information technology security controls has been reported for more than 10 years").

[5] *See* AR 473; AR 1264 (§ E.3).

[6] The PWS is contained in Section B.5 of the RFP. AR 1152.

For Volume II – Past Performance Factor, the RFP instructed offerors to submit up to three relevant past contracts of over $100 million performed at any point during the three years prior to the proposal submission deadline. AR 1269. Volume III – Price Factor required submitting a government-provided "Price Evaluation Spreadsheet." AR 1270. Volume IV – Veterans' Involvement Factor required offerors to certify that they were Service-Disabled Veteran-Owned Small Businesses ("SDVOSBs"), Veteran-Owned Small Businesses ("VOSBs"), or that they would subcontract with SDVOSBs/VOSBs. AR 1271. In the last volume (Volume V), the RFP instructed offerors to provide signed certifications, any "proposed terms and conditions and/or assumptions upon which the proposal is predicated," and the offeror's price list and schedule from the relevant GSA MAS contract. AR 1271–72.

### 3. Award evaluation criteria

The RFP informed offerors that the project would be awarded "based on the best overall (*i.e.* best value) proposal that is determined to be the most beneficial to the Government . . . ." AR 1272. The RFP made clear that the VA would give "appropriate consideration" to four evaluation factors corresponding to the first four volumes of the offerors' proposals (technical, past performance, price/cost, and veterans' involvement). *Id.* As is often the case, the RFP did not weight the evaluation factors equally. Rather, the "technical" factor was weighted significantly more than "past performance," which in turn was slightly more important than "price/cost," which itself was slightly more important than "veterans' involvement." AR 1272, 1296.

The VA rated the Technical Factor[7] using the following scale: Outstanding, Good, Acceptable, Susceptible to be made Acceptable, and Unacceptable. AR 1286.[8] The VA

---

[7] The Agency centered its evaluation of the Technical Factor on two criteria: "understanding of the problem" and "feasibility of approach." AR 1272–73. The former criterion evaluated "the extent to which [an offeror] demonstrates a clear understanding of all features involved in solving the problems and meeting and/or exceeding the requirements presented in the solicitation and the extent to which uncertainties are identified and resolutions proposed." AR 1273. The latter focused on "the extent to which the proposed approach is workable and the end result achievable." *Id.*

[8] The VA provided this adjectival rating scale in response to an offeror's question. AR 1286 (question 59). In general, agency "answers to bidder questions amend[] the solicitation." *BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 689 n.15 (2012) ("GAO decisions support the view that such answers, when circulated to all offerors as an attachment to an amendment signed by the contracting officer, constitute an amendment of the solicitation."); *see also Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1311 (Fed. Cir. 2016) ("[T]he questions and answers posed during an agency

defined these ratings in such a way that there was noticeable overlap between them. AR 3980.  According to the source selection slides prepared by the Agency, a proposal is "outstanding" if it "meets or exceeds all of the Government's requirements, contains extensive detail, demonstrates a thorough understanding of the problems, and is highly feasible (low risk)."  *Id.*  A "good" proposal "meets or exceeds all of the Government's requirements, contains at least adequate detail, demonstrates at least an understanding of the problems, and is at least feasible (low to moderate risk)."  *Id.*  An "acceptable" proposal is one that "at least meets all of the Government's requirements, contains at least minimal detail, demonstrates at least a minimal understanding of the problems, and is at least minimally feasible (moderate to high risk)."  *Id.*[9]

For the second evaluation factor (past performance), the VA assessed "the relevant risks associated with an Offeror's likelihood of success in fulfilling the solicitation's requirements as indicated by that Offeror's record of past performance."  AR 1273.  In the RFP, the VA reserved the right to "obtain past performance information from any available source" and "contact customers other than those identified by the Offeror when evaluating past performance."  *Id.*  Unlike how the VA evaluated the Technical Factor, the Agency evaluated the Past Performance Factor using the following four-part scale: High; Moderate; Low; or Unknown Risk.[10]

The evaluation of the third and fourth factors (price/cost and veterans' involvement, respectively) was straightforward.  The Agency explained that it would calculate the total cost by "adding the total of all line-item prices, including the optional periods and the optional task."  AR 1274.  The VA would credit offerors under the fourth

---

solicitation . . . play a central role in the interpretation of the solicitation provisions."); *Scientific Research Corp.*, B–260478, 95–2 CPD ¶ 8, 1995 WL 404157, at *5 (Comp. Gen. July 10, 1995) (explaining that "information disseminated during the course of a procurement that is in writing, signed by the contracting officer, and sent to all offerors, meets all the essential elements of a solicitation amendment and will therefore bind both the offerors and the agency" (citation omitted)).

[9] The other two adjectival ratings are not relevant to this case, but the Agency defined them in a similarly vague way.  The RFP informed offerors that "a rating of no less than 'Acceptable' must be achieved for the Technical Factor" for the Agency to consider the offeror for an award. AR 1272.

[10] This scale was also given as an answer to an offeror's question.  AR 1286 (question 60); *see supra* note 7.

factor (veterans' involvement) for either being an SDVOSB/VOSB or using certified SDVOSBs/VOSBs as subcontractors.[11]  AR 1275.

### 4.  The VA's TSS 2.0 contract award decision

On October 21, 2024, the Agency received eight timely proposals in response to the TSS 2.0 RFP.  AR 4117.  The contracting officer ("CO") provided the following table in her source selection decision report, summarizing the offerors and their ratings (Offeror "B" is BAH and Offeror "H" is TISTA):[12]

| Offeror | Technical Factor | Past Performance Factor | Price/Cost Factor (Total Evaluated Price) | Veterans Involvement Factor |
|---|---|---|---|---|
| B | Outstanding | Low Risk | $316,484,211.38 | Some Consideration |
| C | Good | Low Risk | [* * *] | Some Consideration |
| D | Acceptable | Unknown Risk | [* * *] | Full Credit |
| E | Acceptable | Low Risk | [* * *] | Some Consideration |
| F | Acceptable | Low Risk | [* * *] | Some Consideration |
| G | Acceptable | Low Risk | [* * *] | Some Consideration |
| H | Acceptable | Low Risk | $299,992,135.52 | Some Consideration |

AR 4118.

In the CO's source selection decision document that explained her decision to award the TSS 2.0 contract to BAH, the CO noted BAH's "Outstanding" rating in the Technical Factor — "the most important factor."  AR 4119.  Further, BAH received two "Significant Strengths" in that factor: one for BAH's "comprehensive approach to support

---

[11] The RFP informed offerors that they would receive full "credit" if they were an SDVOSB or VOSB, and that they would receive "some consideration" if they subcontracted with an SDVOSB or VOSB.  AR 1271.

[12] The CO's report notes that "the eight Offerors were assigned alphabetical identifiers" in order "to retain anonymity throughout the selection decision process."  AR 4117.

audit remediation and manage configuration controls and vulnerability management across the VA," and one for "its management methodology that will be used for executing the effort." AR 4119–20. The CO observed that BAH "was not assessed with any Significant Weaknesses, Weaknesses, or Deficiencies." AR 4123.

In comparing BAH's proposal to TISTA's, the CO concluded that BAH's was "significantly technically superior." AR 4131. TISTA received an "Acceptable" Technical Rating — two steps lower than BAH's "Outstanding." TISTA also had "no Significant Strengths" and one "Weakness," compared to BAH's two significant strengths and no weaknesses. AR 4132. The CO explained that TISTA's weakness was for its "proposed strategy for supporting VA's multi-SIEM environment using Splunk's Machine Learning Toolkit (MLTK)." AR 4133. Specifically, the CO was concerned that using Splunk MLTK came with several "specific challenges" that TISTA's proposal failed to address. AR 4133–34.

Ultimately, the CO concluded that BAH's proposal "represents an overall better value to the Government than" TISTA's, and that the benefits of BAH's proposal "justify the price premium of 5.50%." AR 4134–35.

### B. The Agency's OCI Determinations

As explained in more detail below, TISTA's central claim here is that BAH has an unmitigated OCI due to BAH's role as a subcontractor on a different VA contract — the Endpoint Support and Operations Monitoring ("ESOM") task order. *See* ECF No. 25 ("Pl. MJAR") at 25 (arguing that "hard facts establish that BAH has a significant impaired objectivity OCI due to its performance under the TSS and ESOM programs").

### 1. The ESOM CO's OCI report

According to the ESOM CO's OCI report, the ESOM RFQ included an attachment "provid[ing] a preliminary list of companies supporting current or future Task Orders that 'may' have an actual or potential OCI with the ESOM effort." AR 4075. The original TSS contract was specifically listed as a contract that could give rise to an OCI with the ESOM contract. *Id*. The ESOM RFQ instructed that "[a]ny Company responding to this solicitation that is either listed in the OCI attachment or anticipates teaming with a company listed on the OCI attachment for this effort is responsible for notifying the Contracting Officer and requesting a formal OCI determination." AR 4075–76.

On July 19 and 22, 2024, in compliance with the ESOM RFQ's instructions, BAH requested the VA to provide a formal OCI determination, specifically regarding BAH's work on TSS.  AR 4076.  BAH provided its own OCI assessment to the ESOM CO.  That assessment expressly addressed a potential impaired objectivity OCI:

> There is no current or anticipated tasking on TSS or any other Booz Allen task order for which Booz Allen would be called upon to evaluate its own services, products, or performance under the ESOM task order or channel new work to ESOM. Accordingly, we are aware of no situation that would prevent Booz Allen from providing impartial advice under ESOM. See FAR 9.505-3.
>
> There is no current or anticipated tasking under TSS that requires Booz Allen to evaluate its own performance under ESOM or channel new work towards ESOM, were it to be awarded the task order. Accordingly, we are aware of no situation that would prevent Booz Allen from providing impartial advice if it were awarded ESOM.

AR 4077 (quoting 4082.3 (BAH email response to ESOM CO)).

The CO specifically asked BAH to address whether it or other TSS contractors could "recommend or influence work to the ESOM vehicle?"  BAH replied in the negative:

> Booz Allen and its TSS subcontracting partners do not have the ability to recommend or influence work towards the ESOM vehicle through our performance on TSS, and we do not anticipate this will change with TSS 2.0.  Instead, on TSS we primarily assist the Government with Material Weakness remediation and IT operations support based on objective criteria and at the direction of the Government.  We provide all work we perform on TSS to Government leads for acceptance, with Government personnel possessing final decision authority on implementation.

> As noted above, an OCI exists only if scope intersections result in a contractor setting the ground rules for a procurement it will later compete in, evaluates or assesses its own work or can channel new work to itself such that its objectivity is impaired, or is in a position to use nonpublic information learned through performance of one service to its unfair competitive advantage in another procurement. Here, rather than conflict, there is harmony in that the various elements of performance serve the same client mission.

AR 4077–78 (quoting AR 4082.3–.4 (BAH email response to ESOM CO)).

For the ESOM procurement, BAH was only proposed as a subcontractor to IT Concepts ("ITC"), the company that was ultimately awarded the ESOM contract. ITC, on July 22, 2024, also "requested an OCI determination on behalf of BAH." AR 4079. Just like BAH, ITC explained to the VA that ITC "does not believe there is a current OCI on the ESOM effort for BAH or any of our subcontractors, based on our and our partner's knowledge of both the TSS and ESOM scope." *Id.* Moreover, ITC pointed out that, "with ITC as the prime, . . . ITC will hold the key program management leadership position and will be responsible for all significant decisions on the program." *Id.* In other words, "ITC subcontractors" — such as BAH — "will not be in a position to direct specific efforts to themselves or leverage information for additional work[.]" *Id.* (quoting AR 4082.114 (ITC letter to ESOM CO)).

In analyzing the OCI issues for the ESOM procurement, the ESOM CO did not rest solely on BAH's and ITC's self-assessments. Rather, a VA contracting specialist sought an OCI Technical Review — a comparison of the ESOM and TSS work for OCI assessment purposes — from a CO's representative ("COR") and program manager ("PM"). AR 4079 (quoting AR 4082.120-.121 ("OCI Technical Review")).[13]  The OCI Technical Review specifically focused on the impaired objectivity issue:

---

[13] The administrative record is not perfectly clear regarding precisely who sought the OCI Technical Review or from whom — *i.e.*, whether the ESOM or TSS contracting specialist sought the review, and/or whether it was the ESOM or TSS COR and PM who prepared the OCI Technical Review. *Compare* AR 4079 (noting that "[o]n July 22, 2024, the CS also reached out to the ESOM [COR] and [PM] to receive an assessment regarding the OCI [issue]") *with* AR 4082.122–.28 (July 19–25, 2024, email chain between various ESOM and TSS contracting personnel). No party argues that it matters, however; and, in any event, the record seems fairly

> When referencing FAR 9.505(a), one of the underlying principles of an [OCI] is the existence of conflicting roles that might bias a contractor's judgment. Assigning someone from the operational side of the house to respond to these findings poses a significant conflict of interest. . . . [I]t is crucial to maintain a clear separation of duties within our organization, particularly when addressing material weakness findings. *The following points illuminate the distinct operational frameworks and work streams of the TSS and ESOM contracts, demonstrating that there is no intersection that could lead to a conflict. In this framework, a contractor could not be tasked with evaluating and potentially mitigating issues related to their own work.*

AR 4082.120 (emphasis added).

The OCI Technical Review continued, explaining *in detail* why there was no OCI problem between the ESOM and TSS contracts:

> The VA's existing material weaknesses are long-standing and systemic. To ensure a thorough and unbiased review, the evaluation of these material weaknesses is conducted by a party independent of VA and VA-contracted staff. This separation of duties is naturally maintained as audits and subsequent findings are performed and issued by the Government Accountability Office (GAO). These findings are delivered directly to Office of Information Security (OIS) Government staff, who then prepare and present them to the Chief Information Officer (CIO). Remediation efforts are directed and driven by Government application or systems teams, not by TSS or ESOM. While specific task actions in support of remediation may be executed by TSS or ESOM staff, these are routine, repeatable activities with oversight and within specific and distinct organizational mission spaces. This organizational separation ensures that the work

---

clear that both ESOM and TSS contracting personnel ultimately reviewed and endorsed the OCI Technical Review. AR 4080 (¶ 8).

> done by these contracts does not overlap, allowing for a more accurate identification of deficiencies and the implementation of effective corrective actions. This process reinforces the credibility of our internal controls and maintains the highest level of accountability and transparency within our operations.

AR 4082.120–.121.

The bottom line is that the ESOM and TSS contracts are fundamentally different:

> TSS contractors are involved in preparing sites based on prior audit findings to ensure readiness for upcoming audits. The contractors provide recommendations for preparation, but there is no remediation work to execute at this stage. When TSS contractors do engage with GAO-issued findings, existing governance and implementation practices further inhibit any possible conflict of interest. The criticality and prioritization of remediation actions are determined by OIS often based on predefined Federal Standards. Neither TSS nor ESOM contractors are involved in developing these Federal Standards, setting priorities, or directing or engaging in government-defined remediation efforts. TSS contractors may propose recommended solutions for these material weakness findings, but they are vetted and approved by OIS government personnel and then coordinated with the government personnel managing the relevant application or system development teams or the enterprise deployment teams.

AR 4082.121. Accordingly, the OCI Technical Review makes clear that ESOM is unrelated to TSS except in the most general sense:

> ESOM focuses on two primary work streams: End User Operations (EUO), which handles local break/fix work and endpoint delivery as directed by facility leadership, and

Enterprise Command Operations (ECO), which manages incident response and service desk support, driven by end-user needs, outages, and performance monitoring. *Neither of these ESOM workloads are related to or constructed due to material weakness finding responses. ESOM contractors will not be assigned the same tasks as TSS contractors, since no OIT organization and management personnel will be assigning work to employees of both contracts.* Organizational boundaries in OIT are clearly documented in the Functional Organizational Manual (FOM) and ESOM contractors are limited to tasks consistent with EUS' organizational responsibilities.

*Id.*

In sum, the OCI Technical Review definitively concluded that there was no possible OCI arising from a contractor's performance of both TSS and ESOM:

[T]he TSS and ESOM contracts operate within separate and independent organizational constructs with several layers of Government employees and leadership providing tactical direction; staff may perform similar technical work on both contracts, but in entirely different contexts and management constructs. *This separation ensures that there is no overlap or influence between the two, thereby eliminating any potential conflict of interest.*

*Id.* (emphasis added).

There is scant evidence cutting the other way. There is some email correspondence between an ESOM contract specialist, [* * *], and another VA IT specialist, [* * *], regarding what appears to be specific TSS PWS provisions. AR 4082.131–.137 (July 23–25, 2024, email exchange). With respect to two or three such PWS items, there is, indeed, some suggestion of a possible OCI. Although the putative mechanics of how the TSS contractor could influence the ESOM performance are sparse, [* * *] *does* twice indicate that whatever the precise concern is, it could be "[e]asily addressed in a mitigation plan and minimal impact." AR 4082.131. The following day, however, on July 26, 2024, [* * *] responded to the ESOM contracting specialist, [* * *] — copying the ESOM CO — to inform him that [* * *] had reviewed BAH's response regarding the OCI issue, and "concur[red] with BAH's assessment of the situation." AR 4082.129.

The ESOM CO then reviewed "all the information" described above, as "presented by the respective COR and PM on the TSS TO." AR 4082. The ESOM CO further "performed additional fact-finding to determine whether an actual or perceived OCI existed." *Id.* "Through this review the CO identified any areas where an OCI could exist and followed up with respective Government [personnel] to ensure [that] the support did not create an OCI." *Id.* The ESOM CO ultimately concluded that "[t]his review satisfactorily resolved all of the CO's concerns based on the available information at hand" and that the TSS contractor and subcontractors "do not have the ability to evaluate their own performance under ESOM, the ability to drive work to themselves, or have had any access to information that would give them an unfair competitive advantage[.]" *Id.* ("Based on the above reviews and determinations, the [ESOM] CO has determined that BAH and the listed subcontractors under TSS do not have a direct and perceived OCI concern as it pertains to the ESOM requirement.").

On September 27, 2024, the VA awarded the ESOM contract to ITC, with BAH as a subcontractor. AR 4065.

### 2. TSS 2.0 OCI determination

Notwithstanding that the VA already had considered OCI issues for the ESOM contract vis-à-vis TSS, the VA examined the same issues for TSS 2.0 early in the procurement process. On September 5, 2024, the TSS 2.0 CO sought approval from a senior VA procurement official to include an "Organizational Conflict of Interest Provision/Clause" in the Solicitation. AR 434. The CO explained that "[t]he general rules of FAR 9.505 have been reviewed and are applicable to this acquisition." *Id.* Specifically, due to the anticipated work in TSS 2.0, the CO was concerned that the awardee would be "routinely expose[d] . . . to programmatic, technical, and financial information" that could give rise to an OCI in *future* procurements. AR 435. The CO proposed, among other things, including "an OCI provision/clause in the subject solicitation and resultant contract/task order [that] puts the awardee on notice that work under it could result in OCI issues that would preclude their participation *in future subsequent related acquisitions*." *Id.* (emphasis added). Several proposed OCI clauses, *see* AR 435, were ultimately included in the Solicitation, including in Section B.2, AR 1131, and VA Acquisition Regulation ("VAAR") 852.209–70 in Section E.5, AR 1264. [14]

---

[14] The "VAAR" is the Veterans Affairs Acquisition Regulation — the VA's FAR supplement, *see* 48 C.F.R., Ch. 8.

14

Section B.2 informed offerors that the TSS 2.0 CO had determined that "potentially significant organizational conflicts of interest may arise, or have arisen, due to the nature of the work the Contractor will perform" under the TSS 2.0 contract "that may preclude the Contractor from being awarded *this and/or future* Office of Information Security (OIS) support contracts in a related area."  AR 1131 (§ B.2(b)) (emphasis added).  Thus, the OCI clause ultimately included in the RFP was broader than the proposed clause in that it put offerors on notice of possible consequences for not only future contracts but for the award of TSS 2.0 itself.  With regard to future contracts, Section B.2 warned that "the [TSS 2.0] *Contractor* may be ineligible to act as a prime Contractor, consultant, or subcontractor" to any other contractor who supplies "the services, system, or major components thereof for any project where the *Contractor* has provided or is providing support as described in FAR 9.505-1 through 9.505-4." [15]  *Id.* (§ B.2(b)) (emphasis added).  Section B.2's consistent and repeated reference to "the Contractor" demonstrates that the VA was primarily concerned not with prospective offerors during this procurement, but with the implications of the TSS 2.0 work on the contract awardee for future procurements.  *See, e.g., id.* (§ B.2(c)) (providing that "[i]f the Contracting Officer requests and *the Contractor* subjects an [OCI] mitigation plan that, after Government review is acceptable to the Government, *the Contractor's* parent corporation, subsidiaries, or other physically separate profit and loss centers may be allowed to act as a subcontractor . . . on *future* TSS contracts" (emphasis added)).

Accordingly, when the TSS 2.0 Solicitation preserved the CO's discretion "to allow a company to participate in an acquisition subject to the submission of an acceptable mitigation plan in accordance with paragraph[s] (d) and (e) [of § B.2] below," it was referring to *future* acquisitions.  *Id.* (§ B.2(b)).  Those two paragraphs, in turn, clearly refer *only* to the selected TSS 2.0 "*Contractor*" — not a prospective offeror.  The TSS 2.0 PWS confirms that the OCI clause "found in Section B of the task order" governs the future, not the challenged TSS 2.0 procurement itself.  *See* AR 1228 (§ B.5, ¶ 6.6) (providing that "since *the awardee* of this TO will provide systems engineering, technical direction, remediation and IT support services, some restrictions on *future* activities of the awardee may be required" (emphasis added)).

---

[15] FAR parts 9.505–1 through 9.505–4 "prescribe limitations on contracting as the means of avoiding, neutralizing, or mitigating organizational conflicts of interest that might otherwise exist in the stated situations."  FAR 9.505 (cautioning that "[e]ach individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract").

On the other hand, Section E of the TSS 2.0 RFP included various "Solicitation Provisions" — some incorporated by reference and some expressly — that govern the procurement and apply to offerors.  AR 1263.  One such provision, as noted above, is VAAR 852.209-70 — Organizational Conflicts of Interest.  AR 1264 (§ E.5).  That clause specifically anticipated the possibility that an offeror's "other activities or relationships" could result in "a person" being "unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired[.]"  *Id.* (VAAR 852.209-70(a)).  It requires "[t]he Offeror [to] provide a statement with its offer which describes, in a concise manner, all relevant facts concerning any past, present, or current planned interest (financial, contractual, organizational, or otherwise) or actual or potential [OCIs] relating to the services to be provided under this solicitation."  AR 1265 (VAAR 852.209-70(b)).  The clause permits an offeror to "provide relevant facts that show how its organizational and/or management system or other actions would avoid or mitigate any actual or potential [OCIs]."  *Id.* Based on any information the offeror provides "and any other information solicited or obtained by the Contracting Officer, the Contracting Officer may determine that an [OCI] exists which would warrant disqualifying the [Offeror] for award of the contract unless the [OCI] can be mitigated to the Contracting Officer's satisfaction by negotiating terms and conditions of the contract to that effect."  *Id.* (VAAR 852.209-70(c)).  In compliance with that VAAR provision, BAH submitted an OCI statement, certifying that "to the best of its knowledge and belief, Booz Allen has not identified any OCI related to the services to be provided under this solicitation."  AR 1606.  This makes sense in light of the ESOM CO's prior determination that BAH's performance of TSS would not give rise to an OCI with respect to ESOM.  AR 4075–82.

On December 19, 2024, the TSS 2.0 CO issued a memorandum that addressed whether BAH had an OCI in the TSS 2.0 procurement.  *See* AR 4061–4074.  The CO observed that the earlier ESOM solicitation had included a list of companies with potential OCI concerns due to their connections with the TSS contract, and that BAH was on that list.  AR 4062.  Additionally, the CO noted that BAH had provided an explanation for why it did not have an OCI regarding its work on both TSS and ESOM, including TSS 2.0.  *Id.*  BAH explained in detail to the TSS 2.0 CO why BAH did not have a biased ground rules OCI, an impaired objectivity OCI, or an unequal access to information OCI.  AR 4062–64; *see also* AR 4112.1–.3 (September 6, 2024, BAH email to TSS 2.0 CO).

The TSS 2.0 CO reviewed both BAH's explanations and the ESOM CO's determination that BAH did not have an OCI based on its role as a subcontractor

supporting the ESOM contract.  AR 4065.  The TSS 2.0 CO — just like the ESOM CO — concluded that BAH did not have an OCI that would require a mitigation plan.  The TSS 2.0 CO reasoned:

> As any potential OCI between ESOM and TSS may also exist between TSS 2.0 and ESOM, I, as the TSS and TSS 2.0 Contracting Officer, thoroughly reviewed the ESOM OCI Review and Determination made on July 30, 2024 (Attachment 1), the TSS TO, the TSS 2.0 PWS, the ESOM PWS, and BAH's September 6, 2024 submission and this review satisfactorily resolved all of my concerns.  Therefore, ***I agree and independently determine that BAH and the aforementioned subcontractors under TSS do not have . . . a direct or perceived OCI concern for the TSS 2.0 effort.***  As such, [BAH] will not be excluded if [it proposes] to be the prime or a subcontractor on the TSS 2.0 effort, as it has been determined that no OCIs exist between TSS/TSS 2.0 and ESOM.

AR 4065 (emphasis added).

In other words, after reviewing all the relevant OCI materials, the TSS 2.0 CO was satisfied that BAH had no OCI — let alone a *significant* OCI — and was free to participate in the TSS 2.0 contract.  *Id.*  The following day, December 20, 2024, the VA awarded BAH the TSS 2.0 contract, finding that BAH's price of $316,484,211.38 was fair and reasonable, and that BAH's proposal represented "the best overall value to the government."  AR 4138.

### C.  TISTA's Bid Protest in this Court

On January 16, 2025, TISTA filed a challenge in this Court to the VA's decision to award the TSS 2.0 contract to BAH.  ECF No. 1.  TISTA subsequently filed an amended complaint, ECF No. 26 ("Am. Compl."), along with its MJAR.  The government and defendant-intervenor BAH filed timely cross-MJARs.  ECF No. 27 ("Def. MJAR"), ECF No. 28 ("BAH MJAR").  All parties filed timely reply briefs.  ECF No. 30 ("TISTA Rep."),

ECF No. 32, ECF No. 34.  This Court held oral argument on the parties' cross-MJARs on April 9, 2025.  ECF No. 36 ("Tr.").[16]

## II.    JURISDICTION AND STANDING

This Court has jurisdiction over procurement challenges — commonly called bid protests — pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870.  *See* 28 U.S.C. § 1491(b).  The Tucker Act specifically gives this Court jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1).  "An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract."  *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012).

No party challenges either this Court's jurisdiction or TISTA's standing to pursue its case.  Nevertheless, this Court has an independent duty to verify that it has jurisdiction over this matter and that TISTA has standing to pursue its action.  Here, this Court finds that it does have jurisdiction, and that TISTA has standing:  TISTA timely submitted a proposal before the RFP's deadline, so it was an actual offeror.  Further, TISTA's allegations — accepted as true for the purpose of the jurisdictional analysis — demonstrate that but for the VA's errors, TISTA would have had a substantial chance at being awarded the TSS 2.0 contract.  *REV, LLC v. United States*, 91 F.4th 1156, 1164 (Fed. Cir. 2024) ("In assessing whether a party was prejudiced [for standing purposes] by purported errors in a procurement process, we must assume that the party will, if permitted to proceed with its claim, prevail on the merits.");  *see also Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003);  *Aero Spray, Inc. v.*

---

[16] This Court notes that it only recently received relevant administrative record documentation from the government that was not included in the filed joint appendix; the files added to the corrected administrative record on February 20, 2025, were not initially provided to this Court.  *See* ECF No. 23.

*United States*, 156 Fed. Cl. 548, 567–68 (2021); *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 687 (2022).

Accordingly, this Court will proceed to the merits of TISTA's procurement challenge.[17]

## III.    STANDARD OF REVIEW

This Court reviews bid protest cases using the standard of review from the Administrative Procedure Act ("APA") § 10(c), 5 U.S.C. § 706(2)(A), considering a challenged agency procurement decision to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  28 U.S.C. § 1491(b)(4); *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019) ("In reviewing a grant of judgment upon the administrative record, . . . we review the agency's actions according to the standards set forth in the Administrative Procedure Act."); *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1226 (Fed. Cir. 2004) ("[W]hen read together, [28 U.S.C. §] 1491(b)(4) and [5 U.S.C. §] 706(2)(A) compel the conclusion that section 1491(b)(4) only incorporates the arbitrary or capricious standard of review of section 706(2)(A).").

For a plaintiff to succeed on the merits in a bid protest case, it must demonstrate at a minimum that either: "(1) the [agency]'s decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted); *see also Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (explaining that the APA standard of review requires a court to determine whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure" (quoting *PGBA*, 389 F.3d at 1225)).  An agency's decision is arbitrary and capricious — and thus lacks a

---

[17] This Court considers prejudice at both the standing and merits stages of a case:

> For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions.  But once we find that a party has standing, we must turn to the merits of the party's claim and determine whether it can prove it was prejudiced based on the record evidence.

*Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226–27 (Fed. Cir. 2019) (internal citations omitted).

rational basis — where the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Procurement challenges pursuant to 28 U.S.C. § 1491(b) are resolved via motions for judgment on the administrative record, RCFC 52.1(c), a process "properly understood as intending to provide for an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The process is "designed to provide for trial on a paper record, *allowing fact-finding by the trial court*." *Id.* (emphasis added).[18] In deciding cross-MJARs, this Court considers "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record." *XOtech, LLC v. United States*, 950 F.3d 1376, 1380 (Fed. Cir. 2020) (quoting *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018); *see also Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021).[19]

To succeed on the merits, however, a plaintiff must do more than show some agency error; the plaintiff must also demonstrate that an agency's error was prejudicial. "[T]here is no starting point of presumed prejudice[.]" *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997–98 (Fed. Cir. 2021) ("[T]he challenger of agency action generally bears the burden of showing that an error was harmful — that is, that it was prejudicial."); *see also Shinseki v. Sanders*, 556 U.S. 396, 409 ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

---

[18] "The primary difference between a typical trial and one conducted on the administrative record is that, in the latter, new evidence ordinarily may not be considered. Both the nature of APA review and this Court's rules 'restricts the evidence to the agency record, as may be supplemented consistent with [the law of this circuit].'" *Superior Waste Mgmt. LLC v. United States*, 169 Fed. Cl. 239, 274 (2024) (alteration in original) (quoting *Bannum*, 404 F.3d at 1356).

[19] *See also Noble Supply & Logistics LLC v. United States*, 168 Fed. Cl. 439, 447 (2023) ("[T]he court holds a trial on the administrative record and must determine whether a party has met its burden of proof based solely on the evidence contained in that record." (citing *Bannum*, 404 F.3d at 1355)); *Navarre Corp. v. United States*, 168 Fed. Cl. 361, 367–68 (2023) (explaining that "the parties are limited to the administrative record, and the Court must make findings of fact as if it were conducting a trial on a paper record" and "will then determine whether a party has met its burden of proof based on the evidence in the record" (citing *Bannum,* 404 F.3d at 1354–55)); *Karthik Consulting, LLC v. United States*, 168 Fed. Cl. 95, 103 (2023) ("The protestor has the burden to show by a preponderance of evidence the arbitrary and capricious nature of the agency's decision.").

Our appellate court — the United States Court of Appeals for the Federal Circuit — has explained that, to prove prejudice, a plaintiff "must show there is a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002)). In that regard, a plaintiff must demonstrate "more than a bare possibility of receiving the award." *Blue Water Thinking, LLC v. United States*, 2025 WL 763565, at *9 (Fed. Cl. Mar. 11, 2025) (quoting *Precision Asset Mgmt. Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016)); *see also Bannum*, 404 F.3d at 1358 (affirming the trial court's determination that the plaintiff had not demonstrated a substantial chance of award because its "argument rest[ed] on mere numerical possibility, not evidence").

In sum, "the trial court's factual determination on prejudice . . . is entitled to review for clear error like any finding in a bench trial, and the special concerns applicable to bid protest actions do not alter that review here." *Bannum*, 404 F.3d at 1357; *see also Associated Energy Grp., LLC v. United States*, 131 F.4th 1312, 1319 (Fed. Cir. 2025) ("Prejudice is a factual question that we review for clear error." (quoting cases)); *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1374 (Fed. Cir. 2024) ("We review determinations of standing under the Tucker Act de novo. However, underlying factual findings, including prejudice, are reviewed for clear error." (citations omitted)); *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) ("We review the legal standard for prejudice articulated by the Claims Court de novo, and we review the Claims Court's underlying factual findings for clear error." (citing *Bannum*, 404 F.3d at 1353–54)).[20]

---

[20] *See also Off. Design Grp. v. United States*, 951 F.3d 1366, 1374 (Fed. Cir. 2020) ("Prejudice is a question of fact that we review for clear error." (citing *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1359 (Fed. Cir. 2018)); *Am. Relocation Connections*, 789 F. App'x at 225 ("Prejudice is a question of fact, and we review the findings of the Court of Federal Claims thereon for clear error."); *Diaz v. United States*, 853 F.3d 1355, 1359 (Fed. Cir. 2017) ("Prejudice is a factual question that we review for clear error." (citing *Tinton Falls*, 800 F.3d at 1357–58)); *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013) ("Unlike other issues in this case, prejudice is a question of fact that this court reviews for clear error.").

## IV.    DISCUSSION

### A.    The Government's OCI Assessment Was Reasonable and Supported by the Record

TISTA challenges the VA's determination that BAH did not have an OCI that required mitigation at this stage of the procurement.  Am. Compl. at ¶¶ 107–120.  In particular, TISTA asserts that BAH's involvement in the ESOM task order created the potential for an impaired objectivity OCI because "[t]he overlapping scope of these efforts [. . .] created the potential for the same contractor to evaluate its own work or direct work toward itself."  Pl. MJAR at 22.  Because the CO for the TSS 2.0 procurement relied upon the ESOM CO's OCI determination, and because no mitigation plan was submitted or considered, TISTA argues that "instead of meaningfully assessing the significant conflict and taking action to neutralize the OCI, the VA irrationally concluded that BAH did not have an impaired objectivity OCI after all."  *Id.* at 21.  This of course begs several questions.  Does BAH have any conflict?  If BAH does have an OCI, is it "significant," as TISTA asserts?  And, more importantly, who gets to decide the answers to those questions in the first instance?  The answer to that last question, as explained below, is unequivocally the CO.  And as the FAR and binding precedent from the Federal Circuit make abundantly clear, this Court must apply a deferential standard of review when considering a CO's OCI assessment — both in terms of the facts found and the conclusions drawn from them.  Here, TISTA is not able to meet its burden of proof to show that the TSS 2.0 CO abused her discretion in concluding that BAH had no OCI.

### 1.    Standard of review for claims challenging a CO's OCI determination

FAR Subpart 9.5 tasks COs with identifying whether a procurement — or an offeror participating in the procurement — suffers from any of three general types of OCIs: biased ground rules, unequal access to information, and impaired objectivity.  FAR 9.505-1 — 9.505-3; *see also Appsential, LLC v. United States*, 153 Fed. Cl. 610, 618 (2020) ("There are three situations that give rise to an OCI: 'biased ground rules,' 'unequal access to information,' and 'impaired objectivity.'" (quoting *ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 202 (2007))).  Here, TISTA argues that the CO improperly awarded the TSS 2.0 contract to BAH because it is plagued by an impaired objectivity OCI that was not appropriately mitigated.  Pl. MJAR at 24–26.  Impaired objectivity OCIs arise when a contractor is (or will be) in a position to evaluate its own work under one contract via its work on a different contract.  Relatedly, FAR 9.505-3 provides that "[c]ontracts for the evaluation of offers for products or services shall not be awarded to a contractor that will

evaluate its own offers for products or services, or those of a competitor, without proper safeguards to ensure objectivity to protect the Government's interests."

Pursuant to FAR 9.504, COs have two separate duties. First, they must "identify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible." FAR 9.504(a)(1). Second, they must "avoid, neutralize, or mitigate *significant* potential conflicts before contract award." FAR 905.4(a)(2) (emphasis added). In other words, OCIs that are not significant do not need to be mitigated before award. *Turner Constr. Co., Inc. v. United States*, 645 F.3d 1377, 1386 (Fed. Cir. 2011); *see also PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) ("Section 9.504(a) . . . requires mitigation of 'significant potential conflicts,' but does not require mitigation of other types of conflicts, such as apparent or potential non-significant conflicts.").

Because a CO's ultimate OCI determination is dependent on fact-finding — as well as judgments based on those facts — this Court gives considerable deference to the CO. *PAI Corp.*, 614 F.3d at 1352 ("The contracting officer does have considerable discretion in determining whether a conflict is significant."). In general, challenges to government procurement decisions can be categorized into one of three buckets: (1) claims that the government has violated a statute, regulation, or solicitation provision that required them to take an action; (2) claims that the government has abused its discretion provided in a statute, regulation, or solicitation provision that permits the government to take (or not take) a particular action; or (3) hybrid claims where a statutory, regulatory, or solicitation provision requires a particular analysis or assessment, specifying what factors are to be considered, but leaves the final answer to the government's judgment. *Golden IT v. United States*, -- Fed. Cl. --, 2025 WL 1923271, at *11 (Fed. Cl. July 14, 2025) (explaining that this first bucket involves *de novo* review, even pursuant to the APA). Where — as here — the plaintiff's claims fall into the second or third bucket, "this Court's deference to the agency is at its apex." *Id.* at *14. Indeed, the Federal Circuit recently characterized the deference courts owe to a CO's OCI determinations as "twin layers" of deference. *Oak Grove*, 116 F.4th at 1380. First, as noted above, the CO is granted "considerable discretion to conduct fact-specific inquiries of acquisition proposals to identify potential conflicts." *Id.* (citing *PAI Corp.*, 614 F.3d at 1352–53). Second, there is a "strong presumption" that government officials act consistent with their duties. *Id.* (citing *Sanders v. U.S. Postal Serv.*, 801 F.2d 1328, 1331 (Fed. Cir. 1986)).

TISTA must overcome both layers of deference. This is not easy to do. Generally, courts will affirm COs' determinations so long as they "evince[] rational reasoning and

consideration of relevant factors." *Weeks Marine, Inc.*, 575 F.3d at 1359 (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). In that regard, the Federal Circuit has repeatedly held that the "the FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1382 (Fed. Cir. 2009). Indeed, "[i]n light of the discretion given to COs," the Federal Circuit has all but rejected the notion that a CO can "'violate[]' FAR § 9.504 in such a way as to warrant de novo review." *Id.* The Federal Circuit explained that "[u]nder the trial court's rationale, courts might never review a CO's OCI determination under the 'arbitrary and capricious' standard because every instance in which the court disagreed with the CO's decision could be fashioned as a violation of FAR § 9.504 that triggers de novo review." *Id.* The Federal Circuit concluded that such a "result would be inconsistent with the discretion given to the CO by FAR § 9.505 and the principles underlying the APA." *Id.*[21]

Again, while FAR 9.504(a) "requires mitigation of 'significant potential conflicts,' [it] does not require mitigation of other types of conflicts, such as apparent or potential non-significant conflicts." *PAI Corp.*, 614 F.3d at 1352. Thus, "[t]he contracting officer does have considerable discretion" not only "in determining whether a conflict is significant," but also "to conduct fact-specific inquiries of acquisition proposals" to

---

[21] *See also Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1296 (Fed. Cir. 2020) ("The standard for Claims Court review of a contracting officer's decision with regard to a conflict of interest is highly deferential."); *PAI Corp.*, 614 F.3d at 1351–52 ("The Federal Acquisitions Regulations . . . recognize that 'the identification of [organizational conflicts of interest] and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion.'") (citations omitted); *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1153 (Fed. Cir. 2023) ("[T]he Claims Court erroneously conducted a de novo review of CACI's purported OCI."); *ARINC*, 77 Fed. Cl. at 202 ("The responsibility for determining whether [an OCI] exists and what steps should be taken in response thereto rests squarely with the contracting officer."). On the other hand, perhaps the government can be said to "violate" FAR subpart 9.5 provisions where a CO performs no OCI analysis, or, alternatively, where the CO fails to adhere to the FAR's mandatory instructions (assuming the CO's analysis establishes a factual predicate for the application of such a FAR provision). *See, e.g.*, FAR 9.505-1(a) ("A contractor that provides systems engineering and technical direction for a system but does not have overall contractual responsibility for its development, its integration, assembly, and checkout, or its production **shall not**—(1) Be awarded a contract to supply the system or any of its major components; or (2) Be a subcontractor or consultant to a supplier of the system or any of its major components." (emphasis added)).

determine whether any conflict exists or whether a particular mitigation plan is acceptable. *Id.*[22]

Finally, to successfully support an OCI claim, a plaintiff must "demonstrate that [an agency's OCI] determination is arbitrary or capricious" by "identify[ing] 'hard facts'; a mere inference or suspicion of an actual or apparent conflict is not enough." *PAI Corp.*, 614 F.3d at 1352 (citing *C.A.C.I., Inc. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)); *Michael Stapleton Assocs., Ltd. v. United States*, 2024 WL 2266341, at *6 (Fed. Cir. May 20, 2024).[23]  But the "hard facts" need not demonstrate an "actual conflict" to trigger the CO's duty to consider the implications of a possible OCI; for that, a "potential conflict can be sufficient." *Turner*, 645 F.3d at 1387.   Here, the VA CO readily acknowledged the need to consider the possibility of an OCI based on BAH's role supporting ESOM as a subcontractor.  The decisive question, then, is whether TISTA can show with hard facts that the VA's ultimate conclusion — that BAH's role on the ESOM contract does not give rise to a significant OCI for TSS 2.0 — is arbitrary and capricious.

### 2.  TISTA failed to demonstrate that the CO's OCI determination was arbitrary or capricious

TISTA does not allege that the TSS 2.0 CO entirely failed to conduct an OCI assessment.   Rather, TISTA's claim is that "instead of *meaningfully* assessing the significant conflict and taking action to neutralize" it, "the VA irrationally concluded that

---

[22] Where "the contracting officer determine[s] that no significant potential conflict existed, she is not required to submit a written analysis pursuant to [FAR] 9.506(b)[.]" *PAI*, 614 F.3d at 1353.  In the context of an unequal access to information OCI, the Federal Circuit has defined a "significant potential conflict" to be "one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders." *Turner*, 645 F.3d at 1386 (quoting *PAI Corp.*, 614 F.3d at 1352).  There is no clear regulation or precedent defining what constitutes a "significant" OCI in the impaired objectivity context.  Regardless, the TSS 2.0 CO in this case found that no OCI existed, significant or otherwise; and, as explained *infra*, TISTA has not met its burden of proof to show that her determination was arbitrary and capricious.

[23] *See Samsara Inc. v. United States*, 166 Fed. Cl. 457 (2023) (finding that a protester was unlikely to succeed on merits of impaired objectivity claim because the protester could not show hard facts evincing impaired objectivity); *AAR Mfg., Inc. v. United States*, 149 Fed. Cl. 514, 527 (2020) ("[Protester] has not provided the Court with record evidence or hard facts providing reasons to doubt the affidavits from the Air Force, UDRI, and Taber personnel on which the contracting officer relied to find that no impaired-objectivity OCI exists."); *see also Trident Techs. v. United States*, 158 Fed. Cl. 342, 352 (2022) (requiring that evidence supporting plaintiff's OCI claim amount to more than a disagreement with the CO's conclusions).

BAH did not have an impaired objectivity OCI after all." Pl. MJAR at 21 (emphasis added). Indeed, all parties agree that the TSS 2.0 considered whether "any potential OCI between ESOM and TSS may also exist between TSS 2.0 and ESOM." AR 4065. Another point of agreement is that the TSS 2.0 CO ultimately determined that no OCI existed, period — let alone a significant one. *See* Pl. MJAR at 21.

The trouble with TISTA's argument is not that it lacks *any* facts that might justify a determination that there is a potentially problematic OCI. But the question here is not whether the CO could have reached (and justified) a different determination, but rather only whether her conclusion was arbitrary and capricious. TISTA must meet its burden here by showing at least one of the following: that the CO failed to consider certain facts critical to the OCI issue; that she relied on spurious factual findings (*i.e.*, facts not supported by the administrative record); or, that the ultimate conclusions she reached are not supported by her factual findings. TISTA does none of those things.

For starters, TISTA cannot point to any facts that the CO failed to consider when making her OCI determination. TISTA highlights several examples of BAH's potentially evaluating itself or driving work to itself under the ESOM and TSS 2.0 contracts. *See* Pl. MJAR at 21–23. But every example that TISTA identifies is drawn from the ESOM CO's OCI investigation and analysis in preparation for that contract award. As noted above, the TSS 2.0 CO reviewed and relied, in part, upon the ESOM CO's OCI decision. *See* AR 4065 ("I, as TSS and TSS 2.0 Contracting Officer, thoroughly reviewed *the ESOM CO's OCI Review and Determination made on July 30, 2024 . . . .*" (emphasis added)). TISTA does not challenge this fact in its briefs. Pl. MJAR at 24 ("[T]he TSS 2.0 contracting officer primarily deferred to the ESOM OCI analysis, which she noted 'satisfactorily resolved all of my concerns.'" (quoting AR 4065)). Instead, TISTA argues that, based on language in the ESOM CO's memo, BAH had a duty to "mitigate[], avoid[], or neutralize[]" an implied objectivity OCI *prior to* the contract award. Pl. MJAR at 25. But this critically assumes not only the definitive existence of an OCI, but also that such an OCI is a significant one that had to be mitigated prior to award (and that could not be addressed by the CO during contract performance).

FAR 9.504(a)(2) — which TISTA relies upon to argue that the CO should have required BAH to mitigate its alleged OCI, Pl. MJAR at 25 — instructs the CO to "[a]void, neutralize, or mitigate *significant* potential conflicts *before* award." FAR 9.504(a)(2) (emphasis added). But TISTA admitted in its briefs, Pl. MJAR at 16–17; Pl. Rep. at 7–8,

and during oral argument, that neither the ESOM nor the TSS 2.0 COs found that BAH had a significant OCI:

> THE COURT: But no one in the memo uses the word "significant."
>
> [COUNSEL FOR TISTA]: They — I do not believe they use the . . .
>
> THE COURT: They use the word "minimal."
>
> [COUNSEL FOR TISTA]: Minimal impact, Your Honor, and our position is that, subject to . . . the mitigation strategies, that never came to be. . . . It's a judgment call that certain of these impaired objectivity OCIs would not be a problem because [they could be] easily addressed in a mitigation plan and minimal impact.

Tr. 16:10–25. TISTA thus implicitly sketches a proposed distinction between, on the one hand, a *significant* OCI having a "minimal impact" — and requiring mitigation — and, on the other hand, a *minimal* OCI, *not* requiring mitigation. This Court rejects this linguistic legerdemain: an OCI with "minimal impact" is a minimal OCI — not a significant one. More importantly, TISTA cherry picks mere flecks of evidence from the record in support of its argument. The fatal flaw in TISTA's position is that TISTA ignores all the substantial — if not overwhelming — contrary evidence, including the OCI Technical Review, AR 4082.120–.121. Indeed, the OCI Technical Review, standing alone, provides substantial evidence supporting the TSS 2.0 CO's conclusion.

Because the TSS 2.0 CO found that BAH did *not* have a *significant* OCI, TISTA needed to produce "clear evidence" that the CO's determination was arbitrary and capricious. *Axiom*, 564 F.3d at 1384. [24] TISTA admitted at oral argument, however, that

---

[24] This Court's review of the record here is consistent with the GAO's approach to OCI claims. *See Nortel Gov't Sols., Inc.*, B-299522.5, 2009 CPD ¶ 10, 2008 WL 5473616 at *4 (Comp. Gen. Dec. 30, 2008) ("Once an agency has given meaningful consideration to potential conflicts of interest, our Office will not sustain a protest challenging a determination in this area unless the determination is unreasonable or unsupported by the record."); *N. Wind, Inc.*, B-404880.7, 2012 CPD ¶ 314, 2012 WL 5507339 at *4 (Comp. Gen. Nov. 5, 2012) ("We review an OCI investigation for reasonableness, and where an agency has given meaningful consideration to whether a significant conflict of

it did not contest any of the facts the VA COs found in either the TSS 2.0 or ESOM OCI determination memoranda:

> THE COURT: I'm just trying to figure out, is there any fact in here that you think is wrong and not supported by the record?
>
> [COUNSEL FOR TISTA]: Your Honor, I think — I think the facts — it's hard to point to one specifically.  I think the facts here are not generally in dispute, at least the way we read this memo.

Tr. 10:20 – 11:1.  In other words, TISTA is asking this Court to find that the TSS 2.0 CO's determination was arbitrary and capricious in light of the facts that two different COs found in their OCI memos.  At a minimum, the OCI Technical Review, AR 4082.120–.121, makes TISTA's position untenable.

For two additional reasons, TISTA's attack on the VA's OCI assessment is a bridge too far, particularly given the standard of review.

*First*, to the extent that there is any overlap in duties between the ESOM and either the TSS or TSS 2.0 contracts — a proposition that the OCI Technical Review refutes — both the government and BAH have demonstrated that government oversight supports the finding that any putative OCI is at worst insignificant.  Many of the portions of the ESOM OCI memo that TISTA claims demonstrate the existence of an OCI are all accompanied by the observation that there are "several intermediate Government review steps."  AR 4081.  The government and BAH thus correctly direct this Court's attention to two cases holding that government oversight may render an impaired objectivity OCI insignificant.  Def. MJAR at 26 (citing *Sigmatech, Inc. v. United States*, 144 Fed. Cl. 159, 184 (2019); *Trident Techs., LLC v. United States*, 158 Fed. Cl. 342, 351 (2022)).

In *Sigmatech*, for example, the plaintiff argued that the Army had failed to consider that a subcontractor of the contract awardee "would have to monitor and evaluate its own work" under both the contract at issue and a separate contract that involved Patriot missile support and other technical services.  *Sigmatech*, 144 Fed. Cl. at 164.  The government responded that the subcontractor would not be directly responsible for

---

interest exists, we will not substitute our judgment for the agency's, absent clear evidence that the agency's conclusion is unreasonable.").

evaluating its own work because each task order had a government-appointed CO representative and program manager "whose primary duty and responsibility is to manage his/her specific program." *Id.* at 165. The trial court sided with the government, noting the "substantial government oversight of [the subcontractor's] performance under the [task order at issue.]" *Id.* at 183. The court further rejected the plaintiff's reliance on GAO decisions suggesting that government oversight cannot cure an OCI: "Protestor's attempted, asserted bright-line rule '[t]hat a government official makes the final decision on a recommendation does not cure an organizational conflict of interest' fails because . . . 'the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion.'" *Id.* at 183 (quoting *Axiom*, 564 F.3d at 1381–82).

Similarly, in *Trident Techs*, the plaintiff challenged a CO's determination that the contract awardees had no impaired objectivity OCI. *Trident Techs*, 342 Fed. Cl. at 351. The contract was for maintenance of a military missile testing facility, and the awardees were involved in the "Ground-Based Midcourse Defense Weapon System" contract that apparently helped develop missile defense systems that would be tested at the facility. *Id.* The government argued that the plaintiff had failed to explain how the awardees could manipulate test results in their favor, and regardless, "government oversight and direction would mitigate any impaired objectivity OCI." *Id.* As in *Sigmatech*, the trial court in *Trident Techs* similarly agreed with the government, observing that the "plaintiff's allegation[s] amount to a disagreement with the contracting officer's conclusions rather than a presentation of the 'hard facts' necessary to sustain a finding of an OCI." *Id.* at 352.

Given the facts and precedent, the TSS 2.0 CO reasonably concurred with the ESOM CO that government oversight was sufficient to obviate the need for any further action to address a potential BAH OCI — the existence of which both COs rejected.

*Second*, the "mitigation plans" that the ESOM OCI determination memo mentions in passing would not have to be submitted *before* the TSS 2.0 contract has been awarded, even assuming that the CO were required to consider them at all. That is, even if the TSS 2.0 CO's OCI decision can be read to endorse the need for mitigation plans — which it obviously does not — the TSS 2.0 RFP does not appear to require them *before* the VA's contract award decision. *See* AR 1131 (§ B.2); AR 1264–65 (§ E.5). VAAR 852.209-70(b) requires only that the CO determine that a disqualifying OCI be capable of mitigation "to the Contracting Officer's satisfaction by negotiating terms and conditions of the contract

to that effect." AR 1265. TISTA's reliance on the GAO decision in *AT&T Corp.*, B-417107.4, 2020 CPD ¶ 283, 2020 WL 5231436 (Comp. Gen. July 2, 2020), is misplaced. There, the GAO specifically found that, in that procurement, "the agency would evaluate *an offeror's* mitigation plan, and could disqualify an *offeror* from award based on that plan." *Id.* at *8 (emphasis added). Unlike in *AT&T*, TISTA has not shown that the TSS 2.0 RFP required BAH to submit a mitigation plan before the VA made its contract award decision (again, assuming for the sake of argument, such a plan were required at all). And to the extent that the RFP here conflicted with any of the FAR's OCI provisions (*e.g.*, FAR § 9.504(a)(2)), TISTA is too late to challenge such a patent ambiguity. *See Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation concerning a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."); *Golden IT*, 2025 WL 1923271 at *4 ("Given the . . . [plaintiff's] failure to challenge [ambiguities in the procurement] pre-award, [the plaintiff] must live with whatever interpretation the government implicitly adopted as part of its evaluation." (citations omitted)).

In sum, the CO fully complied with FAR 9.504(a) and the Solicitation. There is ample evidence in the administrative record — not the least of which is the OCI Technical Review — supporting the TSS 2.0 CO's OCI decision. This Court will not second guess either the CO's reasonable determinations that BAH's proposal did not suffer from a significant OCI or, relatedly, that BAH did not need to submit a mitigation plan prior to the VA's contract award decision (even assuming such a plan were required at all).

## B. The VA's Evaluation of TISTA's Proposal Wasn't Arbitrary, Capricious, or Otherwise Contrary to Law

TISTA's faulty evaluation claim has three distinct components. *First*, TISTA argues that the VA unreasonably failed to award TISTA a significant strength for its audit remediation proposal, claiming that the VA treated TISTA disparately as compared to BAH, which did receive a significant strength for an allegedly indistinguishable proposal. *Second*, TISTA argues that the VA unfairly gave TISTA a weakness for incorporating Splunk's machine learning systems into its proposal, despite not giving a weakness to another offeror which also proposed using Splunk. *Third*, TISTA argues that the VA's overall assessment of TISTA as "Acceptable" was arbitrary and capricious. This Court

accepts TISTA's position, clarified at oral argument, that any one of those three errors is prejudicial in the context of the procurement.[25]

### 1. Standard of review for disparate treatment claims

TISTA's first two arguments involve disparate treatment claims, which are governed by the standard the Federal Circuit explicated in *Office Design Group v. United States*, 951 F.3d 1366 (Fed. Cir. 2020). In *Office Design Group*, the Federal Circuit held that for a plaintiff to succeed on a disparate treatment claim, it must demonstrate that either: (1) "the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals"; or (2) "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." 951 F.3d 1366, 1372 (Fed. Cir. 2020) (quoting *Hamilton Sundstrand Power Sys. v. United States*, 75 Fed. Cl. 512, 516 (2007)). Even if a plaintiff can demonstrate that it was treated unfairly by an agency's evaluators, the plaintiff still must show that it was prejudiced by the agency's errors, as explained above. *Sys. Stud. & Simulation*, 22 F.4th at 998.

### 2. The VA did not engage in disparate treatment by not awarding TISTA a significant strength for its proposed use of ServiceNow

TISTA's first disparate treatment claim is that the VA unfairly declined to award TISTA a significant strength for its audit remediation proposal. Pl. MJAR at 27. BAH received a significant strength for an aspect of its audit remediation proposal, but TISTA received nothing — neither a weakness nor a strength — for (allegedly) proposing something substantively indistinguishable. *Id.* at 21; AR 3851–52. TISTA's and BAH's proposals do *appear* to be similar. But the government and BAH highlighted at least one key difference in the proposals, leading this Court to conclude that a remand would constitute "'second guess[ing]' the 'minutiae of the procurement process in such matters as technical ratings . . . , which involve discretionary determinations of procurement officials.'" *Office Design Grp.*, 951 F.3d at 1373 (quoting *E.W. Bliss Co. v. United States*, 77

---

[25] *See* Tr. 83:8 – 13 ("[G]iven TISTA's nearly . . . $17 million price advantage, even a good rating gives TISTA a substantial chance of award . . . if any of the three evaluation errors are corrected.").

F.3d 445, 449 (Fed. Cir. 1996)).  As the Federal Circuit has made abundantly clear, "[t]his is not the Court's role." *Id.*[26]

In Volume I of BAH's proposal, which addressed the Technical Factor, BAH proposed the use of the software ServiceNow as part of its approach to audit remediation (addressed in PWS §§ 5.2.1.1 – 5.2.1.4).  AR 1529.   BAH proposed to "Centralize Audit Remediation Visibility under [Enterprise Cybersecurity Program ("ECSP")] using ServiceNow workflow automation and ECSP-led . . . Planning Sessions."   AR 1529.  Further, BAH's proposal was to "[t]ransition and centralize all dashboards to ServiceNow as the Single Source of Truth (SSoT)." *Id.*  These proposed dashboards would include a system of [* * *] that would "[* * *]." *Id.*

The VA gave high marks to BAH for this audit remediation proposal in the VA's technical evaluation.  AR 3851–52.  Specifically, the VA praised BAH for its plan to centralize the auditing process, writing that "[o]verall, [BAH's] proposed approach would provide significant benefits for the VA's audit remediation and compliances.  By centralizing audit management and aligning activities with the ECSP, this approach enhances oversight and accountability, leading to the timely resolution of audit findings."  AR 3852.  BAH was further lauded for its incorporation of ServiceNow: "By using ServiceNow as the Single Source of Truth[, BAH] will consolidate audit findings into an organized framework, enabling easy assignment of tasks to remediation teams and near real-time progress tracking for leadership."  AR 3851.   The evaluators thus concluded that BAH's proposal "streamlines resource allocation, reduces duplication, and fosters coordination across departments.   With [* * *], improving operational efficiency and strengthening overall security." *Id.*  All this led to the VA's awarding BAH a significant strength for audit remediation.

TISTA's briefs highlight BAH's proposal of ServiceNow as one of the similarities between the two proposals: "Specifically, BAH proposed the use of ServiceNow to centralize the management of audit findings. . . . [L]ike BAH's approach, ServiceNow

---

[26] In its MJAR, the government argues that "there can be no disparate treatment under *Office Design Group* because TISTA's proposal was not '"downgraded' at all."  Def. MJAR at 30.  But this is an incorrect reading of *Office Design Group*.  TISTA's reply brief accurately states the law when it asserts that "[t]he Court has confirmed that the unequal assignment of strengths — not just weaknesses or deficiencies — in two substantively indistinguishable or nearly identical proposals constitutes disparate treatment."  Pl. Rep. at 22 n.6 (citing *Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 290 (2022) (calling the view that "*Office Design Group* only applies to the Court's review of assigned *deficiencies*" a "misreading of the law")).

was key to TISTA's centralized approach."  Pl. MJAR at 28–29.  In fact, TISTA claims that it "proposed a 'nearly identical' approach with the corresponding benefits the evaluators felt warranted a significant strength, yet TISTA received no evaluation credit."  *Id.* at 29. Quoting its proposal, TISTA noted other similarities between its proposal and BAH's, including using ServiceNow as a "single source of truth," creating a centralized dashboard, and aligning all audit efforts with the VA's ECSP.  *Id.* at 30–32.  "In short," TISTA argues, it "offered all the features that the evaluators determined in BAH's proposal 'would provide significant benefits' for the VA.  But only BAH was properly credited with a significant strength."  *Id.* at 32 (quoting AR 3852).

Before examining the differences between the two proposals that BAH and the government pointed out in their briefing and argument, this Court concludes that the mere fact that both BAH and TISTA proposed the use of ServiceNow and alignment with ECSP is not a relevant similarity for disparate treatment purposes.  The PWS *requires* all offerors to "[i]ntegrate all audit efforts into an [ECSP] governance structure" in § 5.2.1. AR 1166.  And the PWS further instructs offerors to provide "ServiceNow Onboarding," implying that ServiceNow is a necessary component of any proposal.  AR 1173 (§ 5.2.1.8); *see also* AR 1184–85 (PWS § 5.2.4 instructing offerors to provide "subject matter experts" experienced in ServiceNow). [27]  Clearly, then, TISTA's and BAH's proposals cannot be substantively indistinguishable simply *because* they both plan to use ServiceNow and align their efforts within the VA's ECSP.  *See* Pl. MJAR at 32.  Besides — as the government and BAH pointed out in their briefs, Def. MJAR at 30; BAH MJAR at 28 — TISTA was in fact awarded a strength for its "strong understanding of the requirements in support of audit remediation and integration of audit efforts into an enterprise program, as well as its ability to make recommendations and track for [material weaknesses] and/or audit finding remediations."  AR 3831.

Accordingly, to determine whether or not TISTA was really treated differently, this Court must examine whether or not the TISTA and BAH proposals had relevant differences.  And there is at least one real difference between the proposals — BAH proposed [* * *].  In the audit remediation section of its proposal, BAH offered to "[* * *]." AR 1529.  The evaluators specifically praised BAH for this idea.  AR 3851 ("The proposed approach also includes [* * *], further enhancing proactive compliance.").  TISTA, in contrast, did not propose an identical [* * *].  In its section on audit remediation, TISTA

---

[27] As BAH observes in its MJAR, "[e]ach one of the seven viable offerors proposed to use the ServiceNow tool."  BAH MJAR at 32–33 (citing AR 1349, 1527–28, 1656–57, 2007, 2334, 2365–66, 2544, 2547).

proposed "[* * *]."  AR 1354 (emphasis omitted).  It is not obvious to this Court that "[* * *]" are the same thing as [* * *].  From the technical evaluation panel's evaluation of BAH's proposal, [* * *] were an important factor in BAH receiving a significant strength.  For this Court to side with TISTA, this Court would have to improperly "second guess" the "minutiae of the procurement process" and "technical ratings."  *E.W. Bliss Co.*, 77 F.3d at 449.  Thus, at a minimum, TISTA has not carried its burden to show that its audit remediation proposal was substantively indistinguishable compared to BAH's, such that TISTA should have received a "significant strength" rather than just a "strength."

### 3.  The VA did not act arbitrarily and capriciously when it penalized TISTA for proposing the use of Splunk

TISTA's second claim is that the VA unfairly assigned TISTA a weakness for proposing Splunk's MLTK.  Pl. MJAR at 33–36.  TISTA similarly contends that the VA engaged in disparate treatment because it didn't penalize another offeror — [* * *] — for also proposing to use Splunk MLTK.  *Id.* at 36–37.

Section 5.2.6 of the PWS informed offerors that the "Contractor shall support the implementation of consistent Audit Logging policies and procedures to address operational availability monitoring and Cybersecurity Operation Engineering (COSE)."  AR 1189.  This involved providing technical services that could "implement the Government-owned SIEM solution(s) and ensure its integration into VA's Enterprise Security Environment."  *Id.*  TISTA's proposal offered to "provide a unified Security Operations Center (SOC) dashboard, amalgamating data from all SIEM tools for holistic security for continuous monitoring to ensure real-time threat mitigation effectiveness."  AR 1359.  To accomplish this, TISTA proposed the use of Splunk MLTK, which could learn "the normal patterns of traffic network over time" and overall facilitate "the seamless collection and storage of logs, prioritizing the high-value assets (HVAs), bedrock and critical systems, and high-impact systems of inventory."  *Id.*

The VA assigned TISTA a weakness for proposing to use Splunk MLTK to fulfill PWS § 5.2.6's requirements.  AR 3833.  The VA noted five "challenges that the proposed solution did not address," including "Data Integration Complexity," "Data Ingestion Costs and Latency," "Resource Demand Across Platforms," "Model Portability and Compatibility," and "Management Overhead."  AR 3833–34.  In other words, the VA was concerned that using Splunk MLTK in the way TISTA proposed would require

synthesizing unwieldy amounts of data that would not be worth the management and resource costs.  AR 3834.

The crux of TISTA's disagreement with the VA's assessment is that, in TISTA's view, "[t]he VA unreasonably assumed, contrary to TISTA's proposal, that the use of Splunk and Splunk MLTK to centralize and enhance the VA's ability to monitor a select subset of high-value assets and bedrock systems meant the transfer of huge datasets."  Pl. Rep. at 24.  TISTA argues that the VA did not correctly read TISTA's proposal:  "TISTA proposed the ingestion of only a select, small amount of priority data and did not propose to do away with Sentinel and OpenSearch by transferring and ingesting all the VA's data from these environments into Splunk."  *Id.*  Predictably, the government disagrees:  "TISTA's proposal plainly supports the agency's conclusion that a transfer of large datasets is required."  Def. MJAR at 35–36.

As an initial matter, this Court notes that TISTA's mere assertion that "priority" or "bedrock" data is a "small amount of priority data" is not clearly sufficient to rebut the VA's concerns that TISTA's proposal would be unwieldy.  This Court is not an expert in IT auditing data collection, but TISTA's briefs do not demonstrate that the VA's view of "priority" data is critically undermined by the administrative record.  Put differently, this judgment call is not one for this Court to make.  Just like the ServiceNow issue, reviewing TISTA's precise use of Splunk MTLK asks this Court to second guess an agency's decision within its sound discretion — and regarding a technical issue, to boot — where deference to the agency is at its apex.  *Golden IT*, 2025 WL 1923271 at *14.  TISTA has not shown that the VA failed to consider some aspect of TISTA's proposal or that the administrative record demonstrates that the VA's conclusions are wrong.  In short, what TISTA challenges here are judgment calls "that the Agency had the discretion to make, and about which the Court has little say, so long as the Agency has explained its determination (as it did here)."  *E. Shipbuilding Grp., Inc. v. United States*, 168 Fed. Cl. 559, 575 (2023).

As for TISTA's claim of disparate treatment, TISTA has not shown that its proposal was substantively indistinguishable from [* * *]'s.  For one thing, it is unclear whether [* * *] and TISTA proposed using Splunk in response to the same section of the PWS.[28]

---

[28] The government notes that "[* * *] did not state that it would use MLTK" specifically; "rather, it stated that it would 'use machine learning algorithms.'"  Def. MJAR at 37 (quoting AR 2016).  This difference is immaterial, however, because this Court finds that TISTA has not shown that the two proposals are substantively indistinguishable, even assuming that both TISTA and [* * *]

TISTA's proposal was in response to PWS § 5.2.6 (Audit Logging, Metrics, SIEM-Based Monitoring Implementation Support).  AR 1359 (TISTA's proposal); AR 1189 (PWS § 5.2.6).  [* * *]'s section on SIEM does not mention Splunk once, *see* AR 2008–2011, and the section where [* * *] *does* mention Splunk does not explicitly connect it to SIEM.  *See* AR 2015–19.  Furthermore, as the government points out, to the extent that both proposals intend to use Splunk to gather and analyze auditing data, [* * *] makes no mention of "data integration requiring connectors and APIs where Splunk's machine learning is discussed."  Def. MJAR at 37; *compare* AR 2015–16 ([* * *]'s proposal regarding performance monitoring and incident analysis) *with* AR 1359 (TISTA's proposal).  While both TISTA and [* * *] propose using Splunk software, the proposals are different enough that this Court cannot conclude that the VA treated them disparately.

### 4.  The VA did not act unreasonably in awarding TISTA a "Good" technical rating

Finally, TISTA argues that the VA unreasonably assigned TISTA an "Acceptable" rating for the Technical Factor, but that TISTA merited at least a "Good" rating.  Pl. MJAR at 38.  TISTA argues that each of its three strengths should have been "significant strengths," or, alternatively, that it deserved a "Good" rating even absent any other agency error.  Both arguments fail to persuade this Court.

First, TISTA directs this Court's attention to some glowing language in the VA's evaluation of TISTA's technical proposal.  Pl. MJAR at 38–40; AR 3831–33.  TISTA highlights wording praising its "strong understanding of the [PWS's] requirements," and the fact that its proposal would "add considerable value."  AR 3831, 3833.  TISTA claims that this language more closely tracks the VA's definition of a "significant strength" — one that "appreciably enhances the merit of a proposal or appreciably increases the probability of successful contract performance" — as opposed to a "strength" — "any aspect of a proposal that, when judged against a stated evaluation criterion, enhances the merit of the proposal or increases the probability of successful performance of the contract."  AR 3981.

Second, TISTA argues that even absent any evaluation errors, it should have received a "Good" technical rating rather than an "Acceptable" rating.  Pl. MJAR at 41.  TISTA points out, *id.* at 31, that an "Acceptable" proposal was one that "at least meets all

---

proposed the use of Splunk MLTK.  This Court's analysis, for the sake of simplicity, does not distinguish between Splunk and Splunk MLTK.

of the Government's requirements, contains at least minimal detail, demonstrates at least minimal understanding of the problems, and is at least minimally feasible (moderate to high risk)." AR 3890. On the other hand, a "Good" proposal was one that "meets or exceeds all of the Government's requirements, contains at least adequate detail, demonstrates at least an understanding of the problems, and is at least feasible (low to moderate risk)." *Id.*

The adjectival ratings are admittedly confusing, largely because, by definition, all "Good" proposals are also "Acceptable." A proposal that "meets or exceeds" the government's requirements will obviously "at least meet" those requirements. But to the extent that this vague rating system produced problems with the evaluations, TISTA was obligated to raise a challenge pre-award. *See Golden IT*, 2025 WL 1923271 at *4; *Blue & Gold Fleet, LP v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation concerning a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.").

Alternatively, setting aside any *Blue & Gold* waiver problem, both of TISTA's arguments ultimately fail because they ask this Court to substitute its own judgment for that of the Agency's in the "minutiae" of technical ratings. *E.W. Bliss Co.*, 77 F.3d at 449. As this Court has explained multiple times, challenges that require this Court to hold that an agency's subjective ratings were wrong

> can succeed when protesters demonstrate inconsistencies in subjective judgments, such inconsistencies require the existence of *nearly identical provisions in the proposals under consideration*. When a court is not convinced that the aspects of the proposals brought to its attention are indistinguishable for purposes of the evaluation, then the exercise instead crosses the line and involves the second guessing of "minutiae" which we are not allowed to undertake, *see E.W. Bliss Co.*, 77 F.3d at 449.

*Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 294 (2022) (quoting *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)) (cleaned up).

Here, TISTA attempts to persuade this Court to reject the VA's technical evaluation as arbitrary and capricious by noting the unremarkable fact that the VA had nice things to say about both TISTA's and BAH's proposals. That is insufficient to show that the VA's final ratings conclusions were arbitrary and capricious. Fundamentally, the decision about whether a strength is "significant" or not — or whether a proposal is "Good" or merely "Acceptable" — is one that the law leaves to the government's discretion. Where, as here, the agency considered all the relevant facts in light of the Solicitation's requirements and came to a reasoned decision, this Court cannot substitute its own judgment for the VA's.

But even if TISTA could show that the VA improperly failed to award it several significant strengths and a "Good" technical rating, TISTA cannot prevail because it cannot show that it was prejudiced by those alleged errors. That is, TISTA is *not* arguing that the CO's source selection decision incorrectly described the true merits of TISTA's proposal — whether in a vacuum or compared to BAH. Rather, TISTA merely claims that the VA's evaluation selected the wrong adjectival label. TISTA, however, points to no specific aspects of TISTA's proposal that the VA somehow ignored when conducting its technical evaluation. In other words, while TISTA objects to the adjectival ratings the VA assigned to TISTA's proposal, TISTA takes no issue with the VA's description of the underlying substantive advantages that TISTA's proposal brings to the Agency. In fact, the entire basis of TISTA's argument is that the VA *correctly* was impressed by aspects of TISTA's audit remediation plan (among other things) but somehow failed to truly credit those findings in the overall adjectival rating. This argument is the opposite of the typical argument — that the agency unduly focused on adjectival ratings to the exclusion of the underlying relative merits or disadvantages of evaluated proposals. *See, e.g.*, *KSC Boss All., LLC v. United States*, 142 Fed. Cl. 368, 387 (2019) (rejecting argument that "the contracting officer 'improperly focused almost exclusively on high-level adjectival ratings, the number of assigned Strengths/Weaknesses, and distorted point scores,' and further, that she 'did not document . . . proposal features underlying those high-level findings'" (quoting plaintiff's brief)).

Thus, even assuming TISTA were correct that the Agency really should have concluded that TISTA's overall proposal was "Good" (rather than merely "Acceptable"), the victory would be hollow, because TISTA does not demonstrate that the CO's ultimate best value tradeoff calculus was flawed. There would be no need for this Court to remand this matter back to the Agency to reconsider its contract award decision because TISTA has not shown that the Agency's overall assessment of the relative substantive

advantages and disadvantages of the offerors' proposals was unsupported by the administrative record.[29] This is simply not a case where the CO merely counted strengths and weaknesses or mechanically considered only adjectival ratings. *See* AR 4134–35. The CO clearly understood the substantive tradeoffs in this procurement and cogently selected BAH. TISTA fails to demonstrate that there is a not-insubstantial chance that labeling some aspect of its proposal as a significant strength (instead of a regular one) — or assigning TISTA an overall higher adjectival technical rating — would change the CO's selection.

## V.    CONCLUSION

The Clerk is directed to enter **JUDGMENT** for Defendant, the United States, and Defendant-Intervenor Booz Allen Hamilton; their MJARs are **GRANTED**. TISTA's MJAR is **DENIED**.

**IT IS SO ORDERED**.

<u>s/Matthew H. Solomson</u>
Matthew H. Solomson
Chief Judge

---

[29] Because TISTA fails to succeed on the merits, this Court does not reach TISTA's injunctive relief request. Pl. MJAR at 43.